UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WAYNE ANDERSON; dba VISIONWORLD | § | |
| ENTERTAINMENT, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-1211 |
| | § | |
| HARVEY BAKER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court is Original Complaint and Application for Injunctive Relief (Doc. 1) filed by Plaintiffs Wayne Anderson and Roxell Richards, individually and d/b/a Visionworld Entertainment ("Plaintiffs" or "Visionworld") against Defendants Harvey and Shannon Baker ("Defendants" or the "Bakers").  The complaint sets forth fourteen claims for relief, principally for fraudulent trademark registration, trademark infringement, trademark dilution, trade-dress infringement, copyright infringement, breach of contract, and tortious interference with contractual relations.  (*Id.* ¶¶ 53–93).  Plaintiffs seek permanent injunctive relief, declaratory relief, and damages.  (*Id.* ¶ 105).  Upon review and consideration of the application, response, and reply; the testimony and evidence presented at the three-day evidentiary hearing, and the applicable law, the Court grants, in part, Visionworld's application for preliminary injunction.

## I.    Background

Visionworld is a Texas-based entertainment consulting and management company that is owned and operated by Anderson and Richards.  Harvey Baker and Shannon Baker are the parents and legal representatives of their fifteen-year-old daughter, Kaylah Baker.  Kaylah

aspires to become a professional singer and entertainer.  She began performing in local pageants and competitions when she was six years old under the name "Kaylah Baker."  (Doc 2 ¶ 10).  In May 2013, Kaylah and Shannon met Anderson after Kaylah performed at an NBA All-Star event in Houston.  The parties were introduced by Anderson's client, "Miss Mykie," the host of a popular show on the B.E.T. Network.  After the meeting, Shannon contacted Anderson and solicited his services to "take Kaylah's career to another level."  (*Id.* ¶ 9).

On May 25, 2013, the parties entered into an "exclusive management agreement" ("the Agreement").  (Exclusive Management Agreement, Pl.'s Ex. 2).  The purpose of the agreement was "to promot[e] and enhance[] [Kaylah]'s career and to assist in all business transactions with associates and affiliates in regards to all aspects of entertainment such as music, television, and film."  (*Id.* ¶ 1.01).  Under the Agreement, Anderson was obligated to "oversee and manage [Kaylah's] business affairs in its entirety and to control the promotion and production of such said projects in music, television and film."  (*Id.* ¶ 3.01).  For her part, Kaylah agreed to perform at all bookings that Visionworld arranged, to perform music selected by Visionworld, and to attend all scheduled meetings and rehearsals.  (*Id.* ¶ 3.02).  In addition, Kaylah and her parents agreed to forward to Visionworld all inquiries and information regarding prospective bookings.  (*Id.* ¶ 3.01).  Her parents also agreed to provide an initial deposit of $2,000 for services to be rendered.  (*Id.* ¶ 3.02).  The Agreement gave Visionworld the right to "have full, exclusive and complete authority and discretion in the management and control of the business of the exclusive Agreement for the purposes herein stated and [to] make all decisions affecting the business of the Agreement in regards to [Kaylah] and will also consult with [Kaylah's] guardian."  (*Id.* ¶ 5.01).  The Agreement allocated 75% of all profits, losses, and expenses to Kaylah and 25% to

Anderson.  (*Id.* ¶¶ 4.01, 7).  The term of the agreement was one year with an option to renew for a second one-year term.  (*Id.* ¶¶ 1.02 –1.03).

Once the Agreement was signed, Visionworld began developing and promoting a brand and image for Kaylah.  As an initial step, Visionworld contracted with stylist Ebony Tezeno to create a signature look and persona for Kaylah.  Anderson requested that Shannon send him an email with Kaylah's full name and birthdate so that he could draft the management agreement. Shannon sent Anderson an email wherein she wrote Kaylah's full name as: Kaylah Sharvey Baker.  (E-mail Correspondence Between Shannon and Anderson, Pl.'s Ex. 17).  Anderson testified that after he received Shannon's email, he began researching variations of Kaylah's name to see if there were any potential conflicts with other performers in the entertainment industry.  His research revealed that an artist was already performing under the name "Kaylah B," thereby creating a conflict with Kaylah's name.  Tezeno testified that she suggested to Visionworld and the Bakers that Kaylah use the stage name Sharvé, excluding the "y" and adding an accent to her middle name, Sharvey.

Working in consultation with Visionworld, Tezeno created a distinctive and unique "flashback" look for Sharvé, a hybrid of 1980s and 1990s teen fashion.  (E-mail Correspondence Between Tezeno and Visionworld, Pl.'s Ex. 3; Examples of the Sharvé Trademark and Trade Dress, Pl.'s Ex. 5; Photograph Depicting Sharvé Trade Dress, Pl.'s Ex. 6).  Sharvé's "signature look" included a side-ponytail or hat and a heart-sign hand gesture.  (Doc. 1 ¶ 29; Pl.'s Ex. 5). All parties testified that great care was taken to ensure that Sharvé's look was wholesome and age appropriate.  Visionworld created a fan club for Sharvé, the "Sweetheartz," and set up a charitable foundation in her name, the "Sweetheart Foundation."  (Pl.'s Ex. 3; Examples of the Sharvé Trademark and Trade Dress).

Visionworld also contracted with a graphic designer who created various designs and logos incorporating the name Sharvé to be used for promotional goods and merchandise.  (Pl.'s Ex. 3; Doc. 1 ¶ 19).   In July 2013, Visionworld hired a web designer to create Sharvé's promotional website.   Shannon Baker purchased the domain name iamsharve.com for $25.  (Domain Registration, Def.'s Ex. 5).  In August 2013, Shannon gave Visionworld the passwords for the promotional social-media accounts that she had previously created for Kaylah, including Facebook, Instagram, Twitter, and Gmail, so that Visionworld could convert the accounts and manage them under the names Sharvé or iamSharvé.  (E-mail Correspondence Between Shannon Baker and Wayne Anderson, Def.'s Ex. 2; Facebook Screenshot, Def.'s Ex. 4).

Over the next several months, Visionworld invested significant amounts of time and money in developing the Sharvé brand and mark.  Kaylah received "vocal lessons, one-on-one and stage-performance coaching, make-up, and styling."   (Doc. 1 ¶ 24).   Visionworld also funded and coordinated photoshoots, videoshoots, marketing campaigns, concert appearances, and personal appearances for Sharvé.  (*Id.* ¶ 24).  Visionworld also contracted with some of its affiliates, including songwriters, producers, choreographers, and videographers, to record a single and music video of Sharvé entitled "What You Think I'm On?"  ("What You Think I'm On?" Copyright Catalog Entry, Pl.'s Ex. 7; "What You Think I'm On?" Music Video; Pl.'s Ex. 21).  Overall, Visionworld estimates that it invested approximately $100,000 in developing the Sharvé brand and mark.  (Doc. 1 ¶ 32; Expense Reports, Pl.'s Ex. 15).  The Bakers also invested approximately $20,000.  (Doc. 1 ¶ 32; Receipts, Def.'s Ex. 3).

In late 2013, the relationship between Plaintiffs and the Bakers started to break down when the Bakers began questioning the allocation of the funds they invested and demanded an accounting.  The parties, represented by counsel, held a meeting in February 2014 to discuss the

accounting issues.  (Doc. 1 ¶ 33–34).  The parties also disagreed over the social-media accounts.

Visionworld managed these accounts very closely and promptly deleted any photos posted by

Kaylah or Shannon Baker that it found incongruous with the Sharvé mark and brand.  (Doc. 1 ¶

28).  To prevent Visionworld from accessing the accounts, Shannon Baker changed all the

passwords in February 2014.  (*Id.* ¶ 33).  Sometime in late 2013 or early 2014, Anderson

informed Shannon Baker that after the termination of the contractual relationship, Kaylah would

have no rights to the Sharvé name, mark, or any of the associated trade dress.  The relationship

continued to sour,  and on March 3, 2014 Shannon Baker sent Anderson an email terminating the

relationship.  (E-mail Correspondence Between Shannon Baker and Wayne Anderson, Pl.'s Ex.

9).  Thereafter, Shannon Baker contacted many of Plaintiffs' affiliates, including dancers and

songwriters, in an effort to continue Kaylah's relationship with the affiliates.  (Doc. 1 ¶ 45).

Shannon Baker continues to manage and promote Kaylah under the name Sharvé.

Plaintiffs complain that the images appearing on Sharvé's social-media accounts in recent

months are more sexualized and are inconsistent with the wholesome image of Sharvé that

Visionworld created and marketed.  (Recent Images of Sharvé, Pl.'s Ex. 19 & Pl.'s Ex. 24).

Plaintiffs claim that they regularly receive calls and complaints from affiliates who believe that

Visionworld is Sharvé's manager and are troubled by the new image that they believe

Visionworld is creating for Sharvé.  On March 4, 2014, Shannon Baker filed an application with

the United States Patent and Trademark Office ("USPTO") to secure rights to the Sharvé mark.

(Trademark Application, Pl.'s Ex. 11).  On the application, Shannon Baker wrote that the owner

of the mark is "Baker, Kaylah Sharvé aka Sharvé."  (*Id.*).  Shannon further stated that the first

use of the mark was "at least as early as February 15, 2010" and the first use of the mark in

commerce was "at least as early as March 1, 2012."  (*Id.*).  In support of the application,

Shannon attached a flyer incorporating the Sharvé mark as a demonstrative example of the mark's use in commerce.  (*Id.*).  The flyer was for "Teen Healthfest," an event sponsored by Visionworld where Sharvé was scheduled to perform, but which was canceled for inclement weather.  Shannon has also changed the name on YouTube videos of early performances of Kaylah from "Kaylah Baker" to "Kaylah Sharvé Baker."  (Doc. 1 ¶ 41; YouTube Screenshot, Pl.'s Ex. 12).  Visionworld filed a letter of protest with the USPTO against Defendants' trademark application.  (Doc. 1 ¶ 42).

This dispute is over the rights to the Sharvé name, mark, and image.  Much of what has transpired could have been prevented or resolved through clear contractual language.  *See e.g., Hart v. World Wrestling Entm't*, Civ. A. No. 3:10-cv-0975(SRU), 2012 WL 1233022, (D. Conn. Apr. 10, 2012).[1]  Here, the Agreement did not contemplate this highly foreseeable dispute and was completely silent as to the ownership of any intellectual property rights which might be created during the course of the parties' relationship.  Plaintiffs now move for a preliminary injunction that enjoins Defendants from:

> (1) Copying, duplicating, using, or marketing the Sharvé mark in any manner, including but not limited to using the mark on any new or existing website including iamsharve.com, any new or existing accounts on any and all social media platforms including Facebook, Twitter, Instagram, Gmail, MySpace and YouTube, and using the mark on any pictures, artwork, posters, graphics, or other tangibles.
>
> (2) Posting, displaying, or performing Plaintiffs' copyrighted music or recordings in any manner;

---

[1] Booking agreement between professional wrestler and entertainment company which clearly distinguished between "original intellectual property" which was owned by a professional wrestler upon entry into the contract (i.e., legal name, stage name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks gestures, etc.) and "new intellectual property" which was created during the course of the parties' relationship (i.e., "service marks, trademarks, and/or other distinctive and identifying indicia…") and declared that original intellectual property rights would be assigned to the company during the course of the relationship and revert back to the wrestler upon termination and new intellectual property rights would be assigned to the company in perpetuity, governed subsequent claims for violations of the Lanham Act.

(3) Using the registration of the trademark application identified as serial number 86210494; and

(4) Using any and all of Plaintiffs' property and/or proprietary information including but not limited to any and all photographs taken by Visionworld and/or its affiliates, any graphic designs created by Visionworld and/or its affiliates, any props, clothing, flyers, programs, and merchandise created or provided by Visionworld, and any and all names and likenesses of fan clubs regarding Sharvé identified by the word "Sweeheartz" or "Sweethearts."

Proposed Order Granting Prelim. Inj. (Doc. 2-1).

Defendants argue that an injunction is inappropriate.  They contend that Plaintiffs are not likely to succeed on the merits because the mark is invalid under section 1052(c) of the Lanham Act, which prohibits registering the name of a living person without that person's consent. (Def.'s Resp. at 3).  Defendants further contend that the mark is invalid under section 1125(a) of the Lanham Act because Visionworld is not the originator of the goods or services.  (*Id.*).  With regard to the song "What You Think I'm On?,"  Defendants argue that the copyright granted to Plaintiffs is invalid because it was based on Plaintiffs' false representation that the song was made as a "work for hire."  (*Id.* at 3–4).

## II.    Legal Standard

"A preliminary injunction is an 'extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements."  *Nicols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  To obtain a preliminary injunction, Visionworld must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.  *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012).  Each of these factors

presents a mixed question of fact and law.  *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012).  An injunction is an appropriate remedy to cure trademark infringement under the Lanham Act.  15 U.S.C. §§ 1116, 1125(c); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1572 (S.D. Tex. 1996).

## III.    Discussion

### A.    Substantial Likelihood of Success on the Merits

The purpose of the Lanham Act is to "make[] actionable the deceptive and misleading use of marks in [commerce within the control of Congress]…[and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks."  15 U.S.C. § 1127.  Despite the use of the word "registered" in the Act, courts have held that "[a] mark need not be registered in order to obtain protection because ownership of trademarks is established by use, not by registration."  *Bd. Of Supervisors for La. State Univ. Agric. And Mech. Coll. V. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (internal alterations, quotations, and citations omitted).  "There are two elements to a successful claim of infringement under the Lanham Act.  The plaintiff must first establish ownership in a legally protectable mark, and second, show infringement by demonstrating a likelihood of confusion."  *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (internal quotation marks and citations omitted).

### 1.    Ownership of the Sharvé Mark

"Ownership of a mark requires a combination of both appropriation and use in trade."  *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1264 (5th Cir. 1975).  Thus, the mere conception of the mark, without its subsequent use in commerce, is insufficient to confer ownership rights on the conceiver.  *Id.* at 1264–65.  Nonetheless, the origin of a mark may have

some bearing on the issue of who first used the mark in commerce.  Accordingly, the Court considers both issues.

The testimony adduced at the hearing was inconsistent as to the origin of the name Sharvé.  Shannon Baker testified that Kaylah's father, Harvey Baker, created Kaylah's middle name, Sharvey, by combining their names, "Shannon" and "Harvey."  She stated that the "y" in Sharvey is silent, and that the name has always been spelled with an accent above the "e."  Shannon Baker also testified that her husband was the one who first decided to use the name Sharvé as Kaylah's stage name during a discussion between the parents at their home, while she was on the phone with Anderson.  Defendants did not offer an official or certified copy of Kaylah's birth certificate, or any other official or unofficial documentation showing that Sharvey was ever spelled with an accent or without a "y."  In support of their argument that Kaylah's middle name is not spelled with an accent, Plaintiffs offered the email Shannon sent to Anderson wherein she responded to his request for Kaylah's full name and birthday by writing Kaylah's full name as "Kaylah Sharvey Baker." (Pl.'s Ex. 17).  Tezeno testified that she conceived the name Sharvé during a meeting with Visionworld and that she was the one who decided to use the name as Kaylah's stage name.

The evidence on the issue of use is clear that prior to entering the contract with Visionworld, Kaylah performed under the name "Kaylah Baker."  (*See* Resume and Photographs of Kaylah Baker, Pl.'s Ex. 1).  It was not until Visionworld began managing her that she performed under the name Sharvé.  (*See* Pl.'s Ex. 3 (Instagram image of Sharvé signature with caption "My first signature as Sharvé.")).  Visionworld offered evidence of dozens of examples of its commercial use of the mark over the last year, and Defendants offered no evidence of their use of the mark prior to the relationship with Visionworld.

Viewing all the testimony and evidence on this issue, the Court concludes that Visionworld both created the Sharvé mark and first used the mark in commerce.

Defendants contend that Plaintiffs cannot legally register the mark because it is Kaylah Baker's middle name and she never gave consent for Visionworld to trademark her birth name, as required by 15 U.S.C. § 1052(c).  (Doc. 7 at 3).  Section 1052(c) of the Lanham Act provides that no trademark shall be refused registration unless it "[c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent." "This section is intended to protect rights of privacy and proprietorship, not of all persons who bear a particular name, but of those who will be associated with the mark as used on the goods, either because that person is so well known that the public would reasonably assume the connection or because the individual is publically connected with the business in which the mark is used."  *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 956, 989 (8th Cir. 1993) (quoting *Martin v. Carter Hawley Hale Stores, Inc.*, 206 U.S.P.Q. 931, 933 (Trademark Tr. & App. Bd. 1979)).

Plaintiffs argue that the Sharvé mark does not require Plaintiffs' written consent because Kaylah's middle name is Sharvey, not Sharvé, and Sharvé does not contain Kaylah Baker's birth name in any fashion.  (Doc. 9 at 9–10).  This Court, after hearing testimony and viewing the exhibits, concurs with Plaintiffs' position and finds that the name Sharvé is not Kaylah Sharvey Baker's name and does not identify a living individual.  Therefore, 15 U.S.C. § 1052(c) does not apply and Plaintiff was not obligated to obtain written consent from Kaylah or her parents in order to make use of the Sharvé mark in commerce.  Moreover,

> to the extent that the law of trademarks accords special treatment to a trade or service mark that is based on the name of a particular individual, the law presumes that the name has been *used* in connection with a particular trade or product so as to have acquired some secondary meaning in the marketplace.

> Thus, the right that attaches to one's personal name for trademark purposes is the right to use that name in connection with a particular business. Even then, the right to use one's name is not absolute.

*Rick v. Buchansky*, 609 F. Supp. 1522, 1533–34 (S.D.N.Y. 1985) (emphasis in original); *see also John R. Thompson Co. v. Holloway*, 366 F.2d 108, 113 (5th Cir. 1966) ("[A] man has no absolute right to use his own name, even honestly, as the name of his merchandise or business. As such it becomes a trade name or service mark subject to the rule of priority in order to prevent deception of the public.").

The evidence is clear that as between Plaintiffs and Defendants, only Plaintiffs have ever made commercial use of the name Sharvé. Prior to signing the management agreement, Defendants never made independent commercial use of the Sharvé mark. As such, Defendants did not acquire any trademark rights to any portion of the name Sharvé.

Next, Defendants contend, without citing any authority, that Visionworld has no right to register the mark because it is not the "originator" of the goods or services. (Doc. 7 at 3). A similar argument was raised and rejected by the court in *Rick v. Buchansky*, 609 F. Supp. at 1534–36. In *Rick*, the manager of a 1960's "doo-wop" group known as "Vito and the Salutations" obtained a registered trademark of the group's name and sought to enjoin the defendants, the original members of the group who were performing under new management, from using the name. The group sought to invalidate Rick's registration by claiming that the manager "cannot claim ownership of the mark 'Vito and the Salutations' because the public identifies that mark with the performers themselves, and chiefly with Vito Balsamo," the group's original lead singer. *Id.* at 1534–35. The court disagreed and found that the defendants had "not demonstrated that Balsamo developed any particular notoriety during his tenure in that role," such as through "evidence that Balsamo or any other members of the group received particular

11 / 21

media attention, either through exposure on radio or television, through publications in the popular music field, or in teen fan magazines." *Id.* at 1535.  The court concluded that Balsamo had not developed a "following" either while performing with Vito and the Salutations, or after his departure from the group.

The same could certainly be said for Sharvé.  Although the record contains a great deal of evidence that Visionworld has worked to build the reputation and recognizability of Sharvé over the last year, there is no evidence that Sharvé has any measure of fame today.  Sharvé has not received any radio or television exposure.  Each exhibit in the record that is an example of media use of the Sharvé mark is a promotional use of the mark by Visionworld.  There are no instances of outside media attention or interest in Sharvé.  As such, the Court finds that there is no basis for Defendants to argue that the Sharvé mark is identified by the public with the reputation or skill of Kaylah Baker.

In sum, the Court finds that neither of Defendants' arguments regarding the alleged illegality of Plaintiffs obtaining a trademark of the name Sharvé has any merit.  Plaintiffs have met their burden to show that they own the mark by proving that they appropriated the mark and first used the mark in commerce.  Therefore, the only remaining inquiry is whether the allegedly infringing mark creates a likelihood of confusion.

### 2.    *Likelihood of Confusion*

"Likelihood of confusion is synonymous with probability of confusion, which is more than a mere possibility of confusion."  *Elvis Presley Enter., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).  The Fifth Circuit considers the following factors in determining whether a likelihood of confusion exists: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5)

similarity of advertising media use; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *American Rice, Inc.*, 518 F.3d at 329 (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986)).  "The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the…factors." *Id.* (citing *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).  The court is free to consider other factors it deems relevant to determining whether a likelihood of confusion exists. *Elvis Presley Enter., Inc.*, 141 F.3d at 194.  Likelihood of confusion is a factual question reviewed for clear error.  *Id.* at 197.

In evaluating the strength of a mark, courts focus on the senior user's mark.  *Elvis Presley Enter., Inc.*, 141 F.3d at 200.  Stronger marks deserve greater protection because there is an increased likelihood that consumers will confuse the junior user's mark with that of the senior user.  *Id.*  "Marks are normally assigned to categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (citing *Two Pesos, Inc. v. Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

> A generic term refers to the class of which a good is a member.  A descriptive term provides an attribute or quality of a good.  Generic terms receive no trademark protection, while descriptive terms merit protection only if they have secondary meaning.  A suggestive term suggests, but does not describe, an attribute of a good; it requires the consumer to exercise his imagination to apply the trademark to the good.

*Id.* (internal quotation marks and citations omitted).  "'Arbitrary' or 'fanciful' terms…bear no relationship to the product or service with which they are associated." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980).  "An arbitrary mark has a common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers."

*Union Nat'l Bank of Texas., Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*, 909 F.2d 839, 845 (5th Cir. 1990).  "Fanciful" marks are typically "coined words, such as 'Xerox' or 'Kodak.'"  *Id.*  "'The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."  *Xtreme Lashes, LLC*, 576 F.3d at 227.  Any given term's correct classification is a factual issue.  *Id.*

Personal names are generally not protectable unless they have acquired a secondary meaning.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 786 (1992); *see also Nolen v. Lufkin Indus., Inc.*, Civ. A. No. MO-10-CA-48-H, 2011 WL 10581991, at *2 (W.D. Tex. Feb. 3, 2011) (Where plaintiff offered no evidence of secondary meaning, he did not have trademark rights in his first name, Sam.).  Here, however, the Court has already concluded that Sharvé is not Kaylah Baker's name.  Accordingly, the Court will consider only whether the Sharvé mark is inherently distinctive and not whether it has a secondary meaning.

Plaintiffs contend that the Sharvé mark is "inherently distinctive and is entitled to protection without proof of secondary meaning because the word in and of itself has not attached any meaning and is not of a suggestive or arbitrary nature that one would know what the mark would suggest and or mean."  (Doc. 9 at 4).  The Court agrees that "Sharvé" is an inherently distinctive name that bears no relationship to a young female or entertainer.  As such, the mark is strong.

The best evidence of likelihood of confusion is evidence of actual confusion.  *Exxon Corp.*, 628 F.2d at 506 (citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975)).  "[W]hile very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof."

*Pebble Beach Co.*, 942 F. Supp. at 1547 (citing *Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)).  *See La. World Expo., Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984) (holding one instance of actual confusion sufficient to satisfy actual confusion factor).  Plaintiff Roxell Richards testified that she has received calls from numerous Visionworld affiliates and clients who wrongly believed that Sharvé was still under Visionworld's management and expressed concern regarding the new image that she is now presenting.  "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion."  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 447, 486 (5th Cir. 2004).  Roxell's anecdotal evidence of confusion, while not dispositive, pushes this factor heavily in favor of Plaintiffs.  *See, e.g.*, *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159–60 (5th Cir. 1982) (upholding district court's finding of trademark infringement based in part on plaintiff's evidence of actual confusion).

With regard to the remaining six factors, the Court concludes that Plaintiffs have shown that Defendants fully intend to capitalize on the goodwill and reputation generated by Visionworld by using the Sharvé mark to promote Kaylah Baker, now under their management, to young, impressionable, and unsavvy consumers.  As such, the Court concludes that Plaintiffs have met their burden to show infringement of their mark by demonstrating that a likelihood of confusion exists with regard to the image of Sharvé created by Visionworld and the image of Sharvé now being promoted by Plaintiffs.

### B.    Substantial Threat That  Visionworld Will Suffer  Irreparable Harm

"[W]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of defendant's goods or services constitutes an immediate and irreparable injury…."  *See, e.g., Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex.

1999); *Hawkins Pro-Cuts v. DJT Hair*, No. 3-96-CV-1728-R, 1997 WL 446458, at *7 (N.D. Tex. Jul 25, 1997) ("The likelihood of confusion can constitute irreparable harm in a trademark case.").  A likelihood of confusion was clearly established in this case, as Plaintiffs showed that Defendants are promoting the same entertainer using the same name.  Furthermore, Plaintiffs offered testimony that the success of their business is completely dependent upon the image and success of the entertainers and artists that they manage.  By using and promoting the name created and marketed by Visionworld in conjunction with an unwholesome image that is at odds with Visionworld's reputation, Plaintiffs jeopardize Visionworld's goodwill and relationship with existing and potential clients.  Thus, the Court finds that Visionworld has made an adequate showing that its lack of control over the quality of Defendants' use of the Sharvé mark will cause irreparable harm.

### C. The Threatened Injury Outweighs Any Damage That the Injunction Might Cause the Defendant

Plaintiffs contend that Defendants will not be harmed by the issuance of an injunction because Kaylah can simply resume performing under her given name, as she had been from the age of six until just last year.  (Doc. 9 at 13).  Defendants counter that they will be harmed as Kaylah's "sole vocation and source of income is derived from performing, singing and entertaining for fans that know her as Sharvé.  (Doc. 7 at 6).  Defendants further argue that Kaylah is at a critical stage in the development of her career and fan base, and the loss of her right to use the Sharvé name at this time will cause her great harm.  (*Id.*).

The Court finds that the balance of harms weighs in favor of Visionworld.  Kaylah has been performing under her given name since the age of six and this injunction will not prevent her from continuing to do so.  Her only incentive to now perform under the stage name created by Defendants would be to capitalize on the reputation and goodwill created by Visionworld.

That is not a legitimate concern.  Plaintiffs have also offered evidence that Defendants acted in bad faith in submitting a trademark application for the Sharvé mark, which contains false information including the date of the first use of the mark anywhere and the date of the first use of the mark in commerce.  (Pl.'s Ex. 11).  In light of these facts, the Court finds that the balance of harms weighs in favor of granting Plaintiffs' request for relief.

### D.  The Injunction Will Not Disserve the Public Interest

Compliance with Congressional statutes such as the Lanham Act is always in the public interest and the public is served by enjoining the use of infringing marks.  *Quantum Fitness Corp. v. Quantum Life Style Cntrs.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999).  Protecting Visionworld's mark from infringement and preventing consumer confusion in the marketplace is in the public's interest.

Visionworld has satisfied all four requirements of a preliminary injunction based on its trademark infringement claim alone.  As such, the Court need not consider whether Visionworld has met its burden to show entitlement to a preliminary injunction based on its other causes of action.

## IV.  Copyright Infringement

Plaintiffs also request that Kaylah be enjoined from "[p]osting, displaying, or performing Plaintiffs' copyrighted music or recordings in any manner."  Presumably, Plaintiffs' request is in reference to the song "What You Think I'm On?,"  as that is the only song referenced at the hearing or in the parties' briefs.  "In a copyright infringement case, the substantial likelihood of success on the merits prong of the preliminary injunction test is predominant."  *Vault Corp v. Quaid Software Ltd.*, 655 F. Supp. 750, 757 (E.D. La. 1987), *aff'd* 847 F.2d 255 (5th Cir. 1988)

(citation omitted).   Therefore, the Court's analysis for this aspect of Plaintiffs' preliminary injunction request will focus on the merits of Plaintiffs' claim.

The Copying Right Act grants the owner of a copyright exclusive rights to perform and display the copyrighted work publicly.  17 U.S.C. § 106.  "Anyone who uses the copyrighted material without the permission of the owner is liable for copyright infringement."  *Id.* § 501(a).  Copyright protection may extend to "original works of authorship fixed in any tangible medium of expression," including musical works.  *Id.* § 102(a)(2).  Under the Act, "sound recordings and the underlying musical compositions are separate works with distinct copyrights."  *Jordan v. Sony BMG Music Entm't Inc.*, 637 F. Supp. 442, 457 (S.D. Tex. 2008) (citing 17 U.S.C. § 102(a)(2), (7)).  Here, only the copyright to the sound recording is at issue.

"To establish a claim for copyright infringement, a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original."  *Jordan v. Sony BMG Music Entm't Inc.*, 354 Fed. App'x 942, 947 (5th Cir. 2009).  "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright."  *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995) (citing 17 U.S.C. § 410(c)).

Visionworld presented evidence that it holds a valid certificate of registration, number SRu001136695, from the United States Copyright Office for the sound recording "What You Think I'm On?"  (Pl.'s Ex. 7).  Defendants attempt to rebut the presumption created by the Plaintiffs' certificate of registration by claiming that the copyright is invalid because it was based on Plaintiffs' false representation that Kaylah recorded the song as a "work for hire."  (*Id.* at 3–4).  "Courts may find a registration invalid if the copyright claimant willfully misstated or failed

to state a fact that, if known, might have caused the Copyright Office to reject the copyright application."  *Berg v. Symons*, 393 F. Supp. 2d 525, 542 (S.D. Tex. 2005) (citing 1 NIMMER ON COPYRIGHT § 7:20[B])."

The ownership of a copyright vests initially in the author of the work, "that is, the person who translates an idea into a fixed, tangible expression entitled to a copyright protection."  17 U.S.C. § 201(a); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  In the case of a sound recording, for example, ownership of the copyright vests in "the person whose performance is reflected on the recording."  *In re Porter*, 498 B.R. 609, 670 (E.D. La. 2013).  However, in the context of a "work for hire," someone other than the creator is considered the author and owner of the copyright.  A "work made for hire" includes "a work prepared by an employee within the scope of his or her employment" or "a work that is specially ordered or commissioned…."  17 U.S.C. § 101.  The Fifth Circuit has adopted literal interpretation of the statute and held that "a work is 'made for hire' within the meaning of the Copyright Act of 1976 if and only if the seller is an employee within the meaning of agency law, or the buyer and seller comply with the requirements of § 101(2)."  *Easter Seal Soc. For Crippled Children and Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323, 335 (5th Cir. 1987).

The evidence adduced at the hearing does not support a finding that Visionworld employed Kaylah.  Plaintiffs offered no evidence of a written work for hire agreement and the record here does not suggest that a work for hire agreement was intended.  Moreover, any argument by Plaintiffs that copyright ownership in the song should be vested in them because they financed the production of the song is without merit.  *See Forward v. Thurgood*, 985 F.2d 604, 605–06 (1st Cir. 1993) (holding that copyright ownership of tapes of band's recording session was not transferred to tape owner under work-for-hire doctrine where tape owner booked

and paid for studio time for band but did not employ, commission, or compensate band members, and "evidence as a whole" did not "suggest[] that the tapes were prepared for the use and benefit of [the tape's owner]."). Thus, the Court finds that Plaintiffs did not obtain ownership of the copyright to the song "What You Think I'm On?" and has no right to enjoin Kaylah Baker from performing the song. Accordingly, that part of Plaintiffs' request for preliminary injunction is denied.

## V.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiffs' motion for preliminary injunction is granted in part. Defendants, are preliminarily **RESTRAINED AND ENJOINED** from

(1) Copying, duplicating, using, or marketing the Sharvé mark in any manner, including but not limited to using the mark on any new or existing website including iamsharve.com, any new or existing accounts on any and all social media platforms including Facebook, Twitter, Instagram, Gmail, MySpace and YouTube, and using the mark on any pictures, artwork, posters, graphics, or other tangibles.

(2) Using the registration of the trademark application identified as serial number 86210494; and

(3) Using any and all of Plaintiffs' property and/or proprietary information including but not limited to any and all photographs taken by Visionworld and/or its affiliates, any graphic designs created by Visionworld and/or its affiliates, any props, clothing, flyers, programs, and merchandise created or provided by Visionworld, and any and all names and likenesses of fan clubs regarding Sharvé identified by the word "Sweetheartz" or "Sweethearts."

It is further

**ORDERED** that the injunction issued contemporaneously herewith shall be effective upon the posting by Visionworld of a bond in the amount of twenty-thousand dollars ($20,000 U.S.). FED. R. CIV. P. 65(c); *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir.

1990).  The Court finds that this amount is appropriate to protect Defendants in the event that the injunction is later determined to be in error.  It is further

      **ORDERED** that the case is referred to Magistrate Judge Frances H. Stacy for a Rule 16 hearing and the entry of a scheduling order for an expedited trial on the merits.

      SIGNED at Houston, Texas, this 28th day of May, 2014.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE